UNITED STATES DISTRICT COURT
DISTRICT of MINNESOTA

---

| | | |
|---|---|---|
| United States of America, | ) | File No. 23-mj-251 (TNL) |
| Plaintiff, | ) | |
| vs. | ) | Minneapolis, Minnesota March 31, 2023 |
| (1) Julius Garrett Fineday (2) Sharon Marie Rosebear (3) Phillip Fineday, Jr., | ) | **DIGITAL RECORDING** |
| Defendants. | ) | |

---

BEFORE THE HONORABLE TONY N. LEUNG
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

**(PRELIMINARY HEARING)**

Proceedings recorded by digital recording; transcript produced with computer by certified court reporter.

**APPEARANCES:**

| | |
|---|---|
| For the Plaintiff: | U.S. Attorney's Office<br>LINDSEY E. MIDDLECAMP, ESQ.<br>300 South Fourth Street<br>Suite 600<br>Minneapolis, Minnesota 55415 |
| For Defendant Julius Garrett Fineday: | ROBERT D. RICHMAN, ESQ.<br>P.O. Box 16643<br>St. Louis Park, Minnesota 55416 |
| For Defendant Sharon Marie Rosebear: | Office of the Federal Defender<br>AARON J. MORRISON, ESQ.<br>300 South Fourth Street<br>Suite 107<br>Minneapolis, Minnesota 55415 |
| For Defendant Phillip Fineday, Jr.: | Dorsey & Whitney, LLP<br>R.J. ZAYED, ESQ.<br>50 South Sixth Street<br>Suite 1500<br>Minneapolis, Minnesota 55402 |
| Transcriber: | LORI A. SIMPSON, RMR-CRR<br>316 North Robert Street<br>Suite 146<br>St. Paul, Minnesota 55101 |

# I N D E X


| | PAGE |
|---|---|
| **NICOLE LOPEZ** | |
| Direct Examination by Ms. Middlecamp | 10 |
| Cross-Examination by Mr. Richman | 45 |
| Cross-Examination by Mr. Morrison | 63 |
| Cross-Examination by Mr. Zayed | 71 |
| Redirect Examination by Ms. Middlecamp | 85 |
| Recross-Examination by Mr. Richman | 92 |
| Recross-Examination by Mr. Morrison | 94 |
| Recross-Examination by Mr. Zayed | 95 |

| GOVERNMENT EXHIBITS | REC'D |
|---|---|
| 1 | 7 |
| 2 | 14 |
| 3 | 14 |
| 4 | 14 |

**P R O C E E D I N G S**

**IN OPEN COURT**

(Defendants present)

THE COURT: Good morning, everyone. No, afternoon now. Good afternoon, everyone. And this is the United States District Court for the District of Minnesota, and the cases before the Court today for preliminary only hearing is captioned as follows: The United States of America vs. Julius Garrett Fineday, who is defendant number 1; Sharon Marie Rosebear, who is defendant number 2; and Phillip Fineday, Jr., who is defendant number 3, in Case Number 23-mj-251.

Starting with government counsel, please identify yourself for the record.

MS. MIDDLECAMP: Good afternoon, Your Honor. On behalf of the United States, Assistant United States Attorney Lindsey Middlecamp.

THE COURT: Good afternoon. Thank you for being here.

And for Defendant Fineday?

MR. RICHMAN: On behalf of Julius Fineday, Robert Richman. Good afternoon, Your Honor. And my client is here behind me.

THE COURT: Okay. Thank you for being here,

gentlemen.

MR. MORRISON: Good afternoon, Your Honor. Aaron Morrison appearing on behalf of Sharon Rosebear, who is also present in the courtroom.

THE COURT: Okay.

MR. ZAYED: Good afternoon, Your Honor. R.J. Zayed and Nicole Engisch on behalf of Phillip Fineday, Jr., who is seated right there in the middle behind us.

THE COURT: Okay. Very well. Please be seated.

How do you want to proceed here today?

MS. MIDDLECAMP: Your Honor, there's some information the government could present by proffer, and we have also brought Special Agent Nicole Lopez from the FBI to offer testimony as well.

THE COURT: Okay. All right. Folks, does that sound like what you were expecting?

MR. RICHMAN: Yes, Your Honor.

MR. MORRISON: Yes, Your Honor.

MR. ZAYED: Yes, Your Honor.

THE COURT: Okay. Very well. Please proceed. Government's case.

MS. MIDDLECAMP: Thank you, Your Honor.

As this Court is aware, this matter is before the Court on a criminal Complaint against each of the three defendants, charging them each with a violation of a few

statutes that essentially work together to make it a federal crime to commit felony child neglect on Indian country.

The government will reserve a bit of argument at the end because I anticipate that there are some facts that are not disputed and that there may be some legal arguments between the counsel on what facts are enough to meet the probable cause threshold under those statutes. So I will not argue those statutes or the legal definitions at this time, but I will proffer a bit of information to the Court.

First, the government would move to admit what's been circulated as Government Exhibit 1, which is the final autopsy report generated by the Midwest Medical Examiner's Office out of Ramsey, Minnesota.

THE COURT: Are you intending to just submit the electronic versions or do we --

MS. MIDDLECAMP: I'm happy to have the Court use -- the only difference is that these have a sticker on it, the electronic versions do not, but they are otherwise the same.

THE COURT: Why don't we do the paper if you don't mind.

MS. MIDDLECAMP: Okay. No problem.

THE COURT: But have you published to opposing counsel?

MS. MIDDLECAMP: Yes.

THE COURT: Okay. Why don't we --
MR. RICHMAN: For --
THE COURT: -- just go down the line.
MR. RICHMAN: -- Julius Fineday, no objection, Your Honor.
MR. MORRISON: No objection for Ms. Rosebear.
MR. ZAYED: On behalf of Phillip Fineday, Jr., no objections for purposes of this hearing only.
THE COURT: Okay.
MS. MIDDLECAMP: May I approach the clerk?
THE COURT: Yes. And the Court receives the exhibits of the government for purposes of this hearing.
Okay.
MS. MIDDLECAMP: Your Honor, Special Agent Lopez is not a medical expert and is not going to be offering testimony as a medical expert.
I will summarize for the Court briefly that the final autopsy report, which was received by the FBI in March, related to the Christmas Day death of the individual described in the Complaint as Minor 1.
We do ask that that exhibit be received under seal, as well as the other photos that we'll be putting in through Special Agent Lopez.
And it essentially found two causes of death or a combined effects cause of death --

THE COURT: So I want to just clarify. Any objections to these being under seal?

MR. RICHMAN: No, Your Honor.

MR. MORRISON: No, Your Honor.

MR. ZAYED: No, Your Honor.

THE COURT: These will be sealed.

MS. MIDDLECAMP: Thank you.

The cause of death in the final autopsy report is described as the combined effects of malnutrition and invasive group A streptococcal infection. And below that it lists as other significant condition severe pediculosis capitis, which I'll proffer for the Court is a lice infestation.

The last paragraph on the first page of the autopsy report explains the infection piece of things, namely, that invasive group A streptococcus is an infection that can enter through scrapes or ulcerations. And the medical examiner opined that in this case it may have entered via the ulcerations on the head caused by recurrent pediculosis capitis or recurrent lice.

The autopsy report also describes in detail the evidence of prolonged and severe malnutrition. It notes on the summary page that the medical records that were available at the time showed that this minor had not been to the doctor since 2020. In 2020, when she was four years

old, her weight was 38.1 pounds. Approximately three years later at her time of death, she was seven years old and she had gained less than one pound in those three years, which placed her at less than the 1st percentile of her age group.

So that is the only information other than ultimately on the second page of that summary, so the second page of Government Exhibit 1, it notes that the autopsy findings, medical reports, and investigative reports of the circumstances surrounding death indicate the manner is best certified as homicide.

So if the defense has questions for Special Agent Lopez about the findings of the autopsy report, she may be able to offer limited testimony as the case agent, but is not here in her capacity as a medical expert.

And with that, the government would call Special Agent Lopez to describe the other factual basis for the Complaint.

THE COURT: Very well.

Before you take the stand, if you could raise your right hand, please.

(Witness sworn)

THE COURT: Okay. Grab a seat. So when you are ready to testify, please indicate your readiness by stating and spelling your name slowly for the record, please.

THE WITNESS: My name is Nicole Lopez,

N-i-c-o-l-e; last name Lopez, L-o-p-e-z.

**(Nicole Lopez)**

**DIRECT EXAMINATION**

BY MS. MIDDLECAMP:

Q. And, Special Agent Lopez, let's start by having you physically move the microphone closer to you so that you don't have to lean quite so much and so the recording can capture your voice well.

Okay. Where are you employed?

A. With the Federal Bureau of Investigation.

Q. And what is your job title with the FBI?

A. I'm a special agent.

Q. And are you the case agent who has investigated the death of Minor 1 and the criminal Complaint before the Court today?

A. Yes.

Q. And are you also the individual who swore out the affidavit underlying the Complaint?

A. Yes.

Q. And did you review that affidavit and draft the factual portions of that affidavit such that it's true and correct to the best of your knowledge?

A. Yes.

Q. Would you describe for the Court briefly what occurred -- from the FBI's perspective, what occurred on

Christmas Day of 2022.

A. On Christmas Day I received a phone call that there was a seven-year-old that was unresponsive and pronounced dead at the Indian Health Services located on Red Lake Indian Reservation.

I responded to that call by arriving at Indian Health Services, where I examined the seven-year-old and I also talked -- spoke with the doctor and the nurses on staff, as well as Red Lake Police Department.

I then asked the doctor on call -- or that was working in the ER to help me examine the body so that I could look for any signs of trauma.

And then from there I spoke to Phillip Fineday, Jr. in the hospital waiting room, and then I proceeded to go to the residence of the three, where I spoke to Julius Fineday about what had occurred.

Q. So you went straight to -- or your first place that you went was to Indian Health Services or IHS; is that correct?

A. Yes.

Q. And --

THE COURT: Can you give me a little more context of who the individuals are?

MS. MIDDLECAMP: Certainly.

BY MS. MIDDLECAMP:

Q. So let's start with the child who died. Do you --

THE COURT: Well, not -- the adults.

MS. MIDDLECAMP: Certainly.

BY MS. MIDDLECAMP:

Q. When you indicated that you in the hospital spoke to Phillip Fineday, Jr. or Phillip Fineday, what do you know his relationship to be to the deceased child?

A. He is the grandfather.

Q. And when you say you went to the residence, which residence did you go to after the hospital?

A. The residence of Phillip Fineday, Jr., Sharon Rosebear, and Julius Fineday.

Q. So as of Christmas, all three were residing together as far as law enforcement determined?

A. On Christmas only Julius and his children were in the home, but it was the residence of all three of them.

Q. And what is the relationship of Sharon Rosebear to the deceased child?

A. The grandmother.

Q. And what is the relationship of Julius Fineday to the deceased child?

A. The father.

Q. And while you were at the hospital, you indicated you had an opportunity to examine the child; is that correct?

A. Yes.

Q. And were you present when photos of the child were

taken?
A. Yes.
Q. Have you reviewed three photos in advance of today's hearing and confirmed that they are photos of the deceased child?
A. Yes.
Q. And they were taken in your presence?
A. Yes.
THE COURT: By the way, where is this residence?
THE WITNESS: In Ponemah.
BY MS. MIDDLECAMP:
Q. And is -- where is Ponemah located?
A. Ponemah is located on Red Lake Indian Reservation. Right now we only have a GPS coordinate to locate it.
Q. It doesn't have --
A. We don't have an exact address.
Q. -- a traditional street address?
A. Not that we know of.
Q. At times in this investigation have witnesses described it as the blue house?
A. Yes.
Q. And so if we talk about the Ponemah house or the blue house, do you understand that to be referencing the house where Sharon Rosebear, Julius Fineday, and Phillip Fineday resided with numerous children?

A. Yes.

MS. MIDDLECAMP: Your Honor, the government moves to admit Government Exhibits 2, 3, and 4, also under seal, which are redacted photographs that have also been shared with the defense.

MR. RICHMAN: No objection.

MR. MORRISON: No objection.

MR. ZAYED: Counsel, which one is 2, 3, and 4?

MS. MIDDLECAMP: 2 would be the zoomed out, 3 is the zoomed in, and 4 is [inaudible].

MR. ZAYED: Thank you. No objection, Your Honor.

THE COURT: Court receives those government exhibits for purposes of this hearing.

MS. MIDDLECAMP: May I approach?

THE COURT: Yes, please. Thank you.

MS. MIDDLECAMP: And I believe I stated, but just to make clear, the government moves to admit those under seal as well.

MR. MORRISON: No objection.

MR. RICHMAN: No objection.

MR. ZAYED: No objections, Your Honor.

THE COURT: Under seal -- these are all under seal.

BY MS. MIDDLECAMP:

Q. Special Agent Lopez, would you describe what you were

able to observe when you examined the child.

A. First we noticed that the hair was very matted of the minor, and upon closer look we noticed that there was live and dead bugs -- it looked like multiple types -- inside of her hair. We also noticed that there appeared to be a little bit of swelling on her face and that she was very malnourished.

Q. And what steps were taken next with regard to the examination of the child's body?

A. So I asked the doctor to take a visual exam with me, and she confirmed that she saw the lice in the hair, as well as possible other bugs, and severe malnutrition. And from there we requested an autopsy and we spoke to the family about the autopsy, and then we contacted Midwest Medical Examiner's Office and Whispering Pines Funeral Home for transport to Midwest Medical Examiner's Office.

Q. And as far as you know, was an autopsy conducted?

A. Yes.

Q. And have you reviewed that final autopsy report that has already been admitted as Government Exhibit 1?

A. Yes.

Q. And based on your review of the autopsy report and your observations of the child, although you're not a medical witness, did you agree with the conclusions that are summarized on the first two pages?

A. Yes.
Q. I'd like to ask you some questions about the household dynamics as far as your investigation has revealed, and when I ask these questions, I am limiting them to the time frame leading up to the minor child's death, not whatever is the current dynamic. Okay?
What did you, based on your investigation and conversations with others, learn was the composition of the blue house or the Ponemah house leading up to the minor child's death?
A. The main residents were Sharon Rosebear and Phillip Fineday, Jr., along with five children under the custody of Sharon Rosebear. And Julius Fineday also lived in the household with his five children.
Q. And one of Julius Fineday's five children in that house is the deceased child, correct?
A. Yes.
Q. So, in total, the household comprised of the deceased child and her four siblings, correct?
A. Yes.
Q. Five of the deceased child's cousins, correct?
A. Yes.
Q. The two grandparents, Sharon Rosebear and Phillip Fineday, correct?
A. Yes.

Q. And the minor child's father, Julius Fineday?

A. Yes. And there was also at times other adults that might be staying there at times.

Q. Now, you -- in the course of your role as a case agent and knowing what other law enforcement has done, multiple members of the family have been interviewed; is that correct?

A. Yes.

Q. And there are some discrepancies between how long different witnesses say Julius and his five children cohabitated with Sharon and Phillip and the children they cared for; is that fair?

A. Yes.

Q. For instance, Julius Fineday reported to law enforcement they had resided there for nearly a year and a half, correct, or -- yeah, nearly a year and a half?

A. To my knowledge, it was a year and a half or two years.

Q. And --

THE COURT: I'm sorry. Who said that?

BY MS. MIDDLECAMP:

Q. Why don't you describe for the Court, if you can recall, a couple examples of some of those discrepancies on who said who had lived there for how long.

A. To my knowledge, it was that Julius Fineday had stated he lived there approximately a year and a half to two years,

and Sharon Rosebear and Phillip Fineday said it was a shorter amount of time, approximately a year.

THE COURT: So the discrepancy of about a year to a year and a half; was that the discrepancy?

BY MS. MIDDLECAMP:

Q. Approximately?

A. Approximately.

Q. You're also aware that at least one child indicated a time frame of approximately two years that they had lived there?

A. Yes.

THE COURT: Is this immediately prior to the incident that brings us to court?

THE WITNESS: It was the time leading up to the incident, Your Honor.

BY MS. MIDDLECAMP:

Q. So even taking the most conservative approach, the witnesses all were consistent that Julius Fineday and his five children had shared the household with Sharon Rosebear and Phillip Fineday for approximately one year --

A. Yes.

Q. -- leading up to Christmas Day?

A. Yes.

Q. So that's ten children in that household in that year time frame, correct?

A. Yes.
Q. And at least three adults, Sharon Rosebear, Phillip Fineday, and Julius Fineday, correct?
A. Yes.
Q. And then you indicated occasionally another aunt or uncle might stay there from time to time?
A. Correct, mothers and father of the five children under the custody -- well, of specific children under the custody of Sharon Rosebear.
Q. And when we talk about custody, as you sit here today, do you have all the documents necessary to understand who Sharon Rosebear or Phillip Fineday had, quote, legal custody of as opposed to assumed custody?
A. Was that supposed to be for Sharon Rosebear and Julius Fineday?
Q. Yes. I apologize.
A. We do not have any documents supporting that yet.
Q. But throughout the interviews that you conducted or that other law enforcement conducted, is it fair to say that the witnesses generally described two sets of children, one of whom were Julius's children and the other were sometimes simply referred to as Sharon and Phillip's children?
MR. ZAYED: Objection, Your Honor, leading.
THE COURT: Overruled.
THE WITNESS: Am I good to answer?

BY MS. MIDDLECAMP:

Q. You can answer.

A. Yes.

Q. Would you describe some of the statements that Julius Fineday -- we'll start with -- we'll go witness by witness or defendant by defendant.

Was Julius Fineday interviewed?

A. Yes.

Q. On two occasions?

A. Yes.

Q. And generally how did he describe the caretaking duties or division of roles within the household that he shared with his parents?

A. Could you be more specific?

Q. How would you characterize the picture he painted of who was responsible for which children?

A. He was responsible for his children, but he also stated that he would ask for assistance.

Q. And what about for Sharon Rosebear, what did Sharon Rosebear describe in terms of the caretaking duties in the household?

A. That she was responsible for her children, but at times she had taken care of Julius's children when he was in jail and when he would go out.

Q. And same question for Phillip Fineday, the grandfather.

A. That he would assist with certain things in the household, such as food.
Q. And did he limit his assistance only to the children that could be described as Sharon and Phillip's children?
A. No.
Q. Could you give us specific -- without quoting verbatim, what did Phillip Fineday say he would do for all of the children in the house?
A. That he would feed them.
Q. And did Sharon Rosebear make any statements about what she would do for all of the children in the house sometimes?
A. She stated there was times where she made a large meal and she would feed everyone.
Q. And what about medical care?
A. Sharon Rosebear stated at times that she would take all the children to appointments or to receive care.
Q. What did Julius Fineday say about his role in terms of medical care for his five children, including Minor 1?
A. He had not taken them to any appointments. He stated that the last time was probably when their mother was in the picture, but he did bring them in for their COVID shots.
Q. In terms of transportation in the household, what did the defendants describe the dynamic was?
A. The vehicle belonged to Sharon Rosebear and Phillip Fineday, and Julius Fineday did not have a vehicle at the

time or a working one.
Q. So were there times that Sharon Rosebear and Phillip Fineday ran errands for the entire household?
A. Yes.
Q. Were there times where they allowed Julius Fineday access to their vehicle or provide him with transportation?
A. Yes.
Q. Are you aware of whether the food was in walking distance to any food amenities?
A. Yes.
Q. How are you aware of that?
A. During the interview it was stated that it could have been possible to walk.
Q. And did some of the defendants describe instances when Julius Fineday and his children did go get food from a walkable location?
A. I would have to go back and look.
Q. Okay. Did Julius Fineday make any statements about providing payments to his parents in exchange for staying in the home with them?
A. Yes.
Q. What did he generally state about that?
A. He stated that he paid them a monthly rent, approximately 300 to 400 dollars.
Q. And did -- have you learned anything about benefits

Julius Fineday has received for his children?
A. Yes.
Q. What have you learned?
A. That he does receive monthly payments for his children.
Q. And did Sharon Rosebear make any statements to law enforcement about benefits either for the children under her care or for Julius's children?
A. Yes.
Q. What did she generally describe?
A. She said that she received benefits for three of the children.
THE COURT: I'm sorry. What?
THE WITNESS: She received benefits for three of the children under her care or under her custody.
THE COURT: Like who?
THE WITNESS: I would have to check the -- it was three of the five children. I'm not sure of the names, though, Your Honor.
BY MS. MIDDLECAMP:
Q. Did she indicate to law enforcement that she had legal custody of three children and for those three children she received direct benefits?
A. She said that she had legal custody of five, but she was only receiving benefits for three of them at this time.
Q. None of those were Julius's -- Julius Fineday's

children, correct?
A. No.
Q. Did she indicate awareness that Julius Fineday also received additional benefits for his children?
A. Yes.
THE COURT: Did Julius Fineday receive any benefits for Jewel Sky Fineday?
THE WITNESS: He did, Your Honor. We do not have any supporting documentation yet, though.
BY MS. MIDDLECAMP:
Q. But both Sharon Rosebear and Julius Fineday expressed the understanding that they received direct -- that Julius received benefits for each of his children, correct?
A. Yes.
Q. But law enforcement is still waiting on underlying documents about the source of those benefits or the amount per child?
A. Yes.
Q. Did law enforcement ask Sharon Rosebear and Phillip Fineday about whether there were times they could only afford to feed their own children and had to deny food to Julius Fineday's children?
A. Yes.
Q. And generally what did they say?
MR. ZAYED: Objection, Your Honor, confusing, the

constant "they," "they." I want to -- I would like to know who the speaker is.

THE COURT: I think that's fair. Clarify, please.

MS. MIDDLECAMP: Okay.

BY MS. MIDDLECAMP:

Q. What did Sharon Rosebear say when given the opportunity to explain if that dynamic had occurred?

A. I believe she stated that there was generally enough food for everyone.

Q. And what did Phillip -- yeah. What did Phillip Fineday, the grandfather, say about whether he had been able to feed everyone?

A. I can't recall at this time. I would have to go back and look.

Q. Did he describe times where he would cook meals for all of the kids?

A. Yes.

MR. ZAYED: Objection, Your Honor, leading.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MS. MIDDLECAMP:

Q. Did Sharon Rosebear tell law enforcement about any dynamics with regard to the kids of the household and who they believed they could get food from?

A. They believed that they could get food from their

grandfather.
Q. And what did she describe in connection with that statement?
A. That the youngest child under custody of Julius Fineday would follow around her grandfather for food.
Q. And why would she do that, according to Sharon Rosebear? Why Phillip Fineday and not someone else?
A. Because Phillip would give them food.
Q. After swearing out the Complaint in this matter, have you had an opportunity to interview other witnesses with information about the household?
A. Yes.
Q. Generally, without naming specific individuals, what group of people were interviewed?
A. We interviewed at the school, Ponemah schools.
Q. Jewel Fineday did not attend school; is that correct?
A. Correct.
Q. Was she of an age where she was required to attend school?
A. Yes.
Q. Did you have an opportunity to ask Julius Fineday about whether there were developmental or other disability reasons she wasn't in school?
A. Yes.
Q. And what did you learn?

A. That she did not have any disabilities or concerns of why she could not attend school.
Q. What was law enforcement told by Julius Fineday about why she didn't attend the school?
A. Because she had lice in her hair.
Q. In terms of the placement in the household, where was Jewel Fineday residing in the household before she died?
A. Julius and all of his children had mattresses in the living room that they slept on, and Jewel had been in that area prior to her death.
Q. So a common area of the household?
A. Yes.
Q. Did Sharon Rosebear make any statements to law enforcement indicating that she had been aware of the lice situation with regard to Jewel?
A. Yes.
Q. What types of things did she say to law enforcement?
A. She said that she had tried to brush her hair, but also that the -- Julius's children would give lice to the children under her custody as well and she would have to constantly treat them for lice.
Q. And Phillip Fineday was present --
THE COURT: Go ahead.
BY MS. MIDDLECAMP:
Q. Phillip Fineday was present in the same household during

this time frame, correct?
A. Yes.
Q. And, in fact, he was interviewed along with Sharon Rosebear, it was essentially a joint interview of the two of them, correct?
A. Yes.
Q. Did he express that he had been unaware of the lice situation or denied that it had been an issue?
A. No.
Q. Based on your observations of the child, would it have been possible to share a common space and not been aware of her lice infestation?
A. It would not have been -- in my opinion, it would not have been unknown to know that she had lice, based on the condition of her hair, or just that her hair was very matted and needed care.
Q. In the course of interviewing Sharon Rosebear and Phillip Fineday together, did Sharon Rosebear indicate awareness of any other incidents involving lice infestations involving outside intervention?
A. There was indication during the interviews that one of the children of Julius Fineday had been taken by ambulance to the hospital for a lice infestation.
MR. ZAYED: Your Honor, I need to continue objecting because counsel repeatedly talks about "they." I

need to know exactly who said what. It is unfair to --

THE COURT: Standing -- is this a legal objection --

MR. ZAYED: Yes.

THE COURT: -- Counsel?

All right. Sustained. Go ahead. Just rephrase.

MS. MIDDLECAMP: Okay.

BY MS. MIDDLECAMP:

Q. Did Sharon Rosebear make statements to law enforcement indicating Sharon Rosebear's awareness of a prior incident involving a child with lice in the house?

A. Yes.

Q. Now, would you describe the incident that Sharon Rosebear relayed to law enforcement, generally.

A. We had multiple interviews with multiple people about the lice situation and so I cannot recall which specific incident she had talked about.

Q. Did Sharon Rosebear make any comments about her bathing children in the household?

A. Yes.

Q. And did she indicate there were occasions where she bathed Jewel Fineday, the deceased child?

A. Yes, that she had tried.

Q. And sometimes successfully?

A. Yes.

Q. Did she admit that, to her knowledge, Jewel Fineday had not been bathed for many months?
A. Yes.
Q. Did Julius Fineday, the child's father, make a similar admission?
A. Yes.
Q. Did Sharon Rosebear inform law enforcement about times where Julius Fineday was not in the home with his children?
A. Yes.
Q. What types of events did she describe?
A. It was described that he had been in jail and that he would go out on certain nights.
Q. And on those occasions, who was responsible for the children?
A. Sharon Rosebear.
Q. And was Phillip Fineday also in the home at those times?
A. Yes.
Q. Are you aware of any extended periods of time where Phillip Fineday was outside the household?
A. No, not that -- I mean, could you rephrase the question?
Q. Did either Sharon Rosebear or Phillip Fineday tell law enforcement, for instance, that Phillip Fineday had a job that took him out of the house frequently?
A. No.
Q. Did they describe extended trips or times where he

wouldn't have been aware of what was going on in the household?

A. No.

Q. Based on the joint interview with Phillip Fineday and Sharon Rosebear, what was law enforcement's impression on who on an average day was home in that household?

MR. RICHMAN: Objection to law enforcement's impression, relevance and foundation.

THE COURT: Overruled. Go ahead.

THE WITNESS: It was our impression that all three individuals were --

THE COURT: Actually, I think the foundational part is --

MS. MIDDLECAMP: Okay.

THE COURT: -- fair. Build the foundation and then otherwise overruled.

BY MS. MIDDLECAMP:

Q. Your conversation with Phillip Fineday and Sharon Rosebear lasted almost an hour; is that correct?

A. Yes.

Q. And is it fair to say that Sharon Rosebear was more directly communicative?

A. Yes.

Q. And that sometimes Phillip Fineday affirmed his agreement with nonverbals such as "um-hmm," "uh," or other

things, but not verbal full sentences?

MR. ZAYED: Objection, Your Honor, calls for speculation as to what the "um-hmm" means.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MS. MIDDLECAMP:

Q. And were there sometimes where a question was asked where if Sharon Rosebear provided a narrative response, law enforcement expected that Phillip Fineday had an opportunity to correct it or add additional detail if needed?

MR. RICHMAN: Objection, relevance.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MS. MIDDLECAMP:

Q. So based on the conversations with Sharon Rosebear with Phillip Fineday present, regardless of who offered the affirmative description, what were you told about who was home on the average, for instance, school day in that household?

A. That all three individuals, all three adults were home.

Q. Would you list those adults for the record.

A. That was Julius Fineday, Phillip Fineday, Jr., and Sharon Rosebear.

Q. And did they describe which children were also home on the average school day in that household in the year time

frame leading up to Jewel Fineday's death?
A. It was described that Ti -- Minor Victim 1 and another minor were at the home under Julius and there was multiple children, I'm not sure which count, but we've been told by others that there was two that did not attend school under Sharon Rosebear.
Q. Did any of the adults interviewed, Sharon Rosebear, Phillip Fineday, or Julius Fineday, indicate that Jewel Fineday, the deceased child, spent her days at daycare or any other locations other than that home?
A. No.
Q. You indicated earlier that you had an opportunity to do some interviews at the school that was attended by -- or at a school, correct?
A. Yes.
Q. And you confirmed that Jewel Fineday did not attend that school ever, correct?
A. Yes.
Q. Were there children from the same household who did attend that school?
A. Yes.
Q. Did the school witnesses provide law enforcement with any information about who was responsible for caretaking which children at the home?
A. They stated that Julius Fineday took care of his

children and Sharon Rosebear took care of her children.
Q. Did some witnesses make statements indicating ways Sharon Rosebear would assume a communications role for the whole household?
A. Yes.
Q. Would you describe that for the Judge.
A. Multiple witnesses stated that any time there was a concern with any of the children in school, that Sharon Rosebear would be contacted.
Q. Did the school ever take any role in sending food to the household?
A. Yes.
Q. When did that occur --
A. During --
Q. -- generally?
A. During COVID.
Q. And would you describe for the Court how that generally worked.
A. We were told that either Sharon Rosebear or Julius Fineday would pick up the food for everyone.
Q. And when you say "everyone," what do you mean by that?
A. The entire household.
Q. So regardless of whether Sharon Rosebear came to the school or Julius Fineday came to the school, the school provided food for the entire household for that adult to

bring home to the household?
A. Yes.
Q. Did Julius Fineday confirm to law enforcement that he had noticed Jewel Fineday had not gained weight in several years?
A. Yes.
Q. And did he admit that she had not been taken to the doctor?
A. Yes.
Q. Was there any witness statements -- were there any witness statements related to Jewel Fineday or Minor 1's condition in the week or so leading up to her death?
A. Yes, there was conflicting statements.
Q. How were they conflicting?
A. We were told by one witness that she had been laying there for about two weeks. We had been told by another individual that she a couple days prior seemed happy and her normal self.
THE COURT: When you say these individuals, are you referring to the three folks specifically here or some other individuals?
THE WITNESS: Phillip Fineday said before they left for the hotel-casino, that he had seen Jewel or Minor Victim 1 and said that she seemed like her happy, normal self.

BY MS. MIDDLECAMP:
Q. Did one of Minor 1's siblings provide a statement to law enforcement?
A. Yes.
Q. And what did he say to law enforcement about Minor 1's condition in the days leading up to her death?
A. That she had been laying in bed for about two weeks.
Q. And did he indicate whether she could walk?
A. Yes.
Q. What did he say?
A. That she could not walk.
Q. And did Julius Fineday acknowledge that at least the day before her death she could not get out of bed or walk?
A. Yes.
Q. Did Sharon Rosebear express any awareness that Minor 1 had been sick prior to her death?
A. Yes.
Q. Did Sharon Rosebear make any statement about Minor 1 making any requests of people in the household leading up to her death?
A. Yes.
Q. What types of requests did Sharon Rosebear describe hearing Minor 1 make?
A. That she requested medicine.
Q. And did Julius Fineday, Minor 1's father, make any

statements about the request for medicine?
A. Yes.
Q. And what did he say?
A. That she requested medicine and requested her mother.
Q. And what did he say about Minor 1's request for her mother?
A. That she typically doesn't do that.
MR. MORRISON: I'm sorry. Could you repeat that? I didn't hear.
THE WITNESS: That she does not do that.
BY MS. MIDDLECAMP:
Q. He thought that was unusual?
A. Yes.
Q. You mentioned at several points, I believe, in your testimony that grandparents Sharon Rosebear and Phillip Fineday left and went to a hotel at some point near Jewel Fineday's death; is that correct?
A. Yes.
Q. What did law enforcement learn about that hotel stay?
A. That it was provided by the Family and Children Services on Red Lake.
Q. Sorry. I meant from Sharon Rosebear and Phillip Fineday's interview, what did they say about taking the kids to a casino or a hotel?
A. They take them --

MR. ZAYED: Objection to --
A. -- there every year.
MR. ZAYED: -- form, Your Honor, vague.
THE COURT: Overruled. I think -- well, I think you're referring to the two that you just referenced.
MS. MIDDLECAMP: Yes.
THE WITNESS: They take the children every year under Sharon Rosebear's care to the hotel-casino for the water park because it is one of the children's birthday at that time.
BY MS. MIDDLECAMP:
Q. So is it your understanding that from Christmas Eve through Christmas Day, Phillip Fineday, Sharon Rosebear, and the children they considered under their care were not in the household?
A. Yes.
Q. However, it was Phillip Fineday who was at the hospital on Christmas Day when you went there, correct?
A. Yes.
Q. Do you know if the team at the hospital was communicating with Phillip Fineday about Minor 1's condition?
A. No. We were the ones that had told him.
Q. How did Sharon Rosebear describe the physical condition of the children that she sometimes referred to as the

children under her care or her kids?
A. That they were -- appeared to look better fed than the children under Julius's care.
Q. And did she describe them as fluffy or chubby?
A. Yes.
Q. And how did she describe her ability to shop on a tight budget?
A. She stated that she was very good at shopping with a limited budget or saving money.
Q. Both Sharon Rosebear and Phillip Fineday were asked whether they believed Minor 1 had been severely malnourished because of lack of resources in the whole household; is that correct?
A. Yes.
Q. And what did they say about that?
A. One -- Phillip Fineday said that, "I didn't know she liked food."
Q. Did either of them express that --
THE COURT: Say that again. What?
MR. ZAYED: I'm sorry, Your Honor. I missed that.
THE COURT: Yeah. What?
THE WITNESS: He uttered that, "I didn't know she liked food."
BY MS. MIDDLECAMP:
Q. Did either of them express to law enforcement money is

too tight in the house and that's why some of the kids don't get fed?

A. No.

Q. Did they affirmatively deny that that was a fact?

A. It was just stated that Sharon Rosebear could shop on a budget and that Julius sometimes spent money more frivolously when he would go shopping with his children.

Q. But neither Sharon Rosebear or Phillip Fineday ever said they were unable to feed the whole household, if necessary?

A. Yes.

THE COURT: I'm sorry. Who was that again?

BY MS. MIDDLECAMP:

Q. Neither Phillip Fineday nor Sharon Rosebear, despite being asked several times, told law enforcement that there had been times they were unable to feed the whole household because of lack of resources; is that correct?

A. Yes.

MS. MIDDLECAMP: No further questions for this witness at this time.

THE COURT: I've got an area I would like to clarify a little more --

MS. MIDDLECAMP: Certainly.

THE COURT: -- before I turn it over to defense. I'm -- I want a little clearer picture of who is where right around that Christmastime that we're talking about.

MS. MIDDLECAMP: Okay.

THE COURT: Because there's a hotel and then somehow we're back home. So --

MS. MIDDLECAMP: Sure.

THE COURT: -- I need that clarified more for the record.

BY MS. MIDDLECAMP:

Q. Distinguishing the time frame leading up to Christmas Eve, what did law enforcement learn was the composition of the household up until approximately Christmas Eve at the shared house?

A. That the daily residents were Sharon Rosebear, Phillip Fineday, Jr., Julius Fineday, Jr., and the ten children under the custody of Sharon Rosebear and Julius Fineday.

Q. And when you say "custody," that's your understanding of legal custody arrangements of some sort or another, whether court or familial, correct?

A. Yes.

THE COURT: And to be clear, Sharon's is the seven other --

MS. MIDDLECAMP: Five other.

THE COURT: Five other. Okay.

Clarify when you say --

MS. MIDDLECAMP: Okay.

THE COURT: -- in your view as far as the custody.

BY MS. MIDDLECAMP:
Q. From what you've learned, the household had -- we'll start with maybe the easiest group. Julius Fineday, correct?
A. Yes.
Q. And he has five biological children, correct?
A. Yes.
Q. One of whom was Minor Victim 1?
A. Yes.
Q. And her four siblings, correct?
A. Yes.
Q. So that group of five children can be described as Julius's children, correct?
A. Yes.
Q. Minor 1 also had five cousins who resided in the household, correct?
A. Yes.
Q. And all of them are grandchildren of Sharon Rosebear and Phillip Fineday, correct?
A. Yes.
Q. And as you sit here today, you don't have court documents or Family Services documents that would allow you to say which of those five cousins are official custody versus assumed custody, but in the course of your interviews they were generally referred to as the kids that Sharon

Rosebear and Phillip Fineday considered their set of kids, correct?
A. Yes.
Q. So five cousins, five siblings -- or four siblings, ten children total?
A. Yes.
Q. But then on Christmas Eve, who is it that law enforcement understands left the house?
A. Sharon Rosebear, Phillip Fineday, and the five children under Sharon Rosebear's custody.
Q. And that was something of an annual Christmas trip they took but did not bring Julius Fineday's children on?
A. Yes.
THE COURT: Okay. Thank you. And obviously defense can follow up as they deem appropriate.
MS. MIDDLECAMP: Any other questions for the Court at this time?
THE COURT: So talk me through Phillip Fineday in this scenario. I mean -- well, obviously, I've heard some things. Can you -- what was his caretaking role, if any?
BY MS. MIDDLECAMP:
Q. Special Agent Lopez, what types of duties did Phillip Fineday describe taking in the household as far as a caretaker of the children?
A. As getting food for the children, for all the children

in the household.
Q. Did he specifically state, not nodding or affirming a Sharon Rosebear statement, but did he specifically state there were times he would make a large meal and all the children in the household would be fed?
A. Yes.
Q. And did he describe having access to food in the household to give to the children?
A. Yes.
Q. And did Sharon Rosebear indicate that all of the children of the household would go to grandpa for food instead of grandma because he was more likely to give them food?
A. Yes.
Q. And did Sharon Rosebear specifically describe Julius Fineday's younger daughter, not Minor 1, following Phillip Fineday around because she knew he would feed her?
A. Yes.
Q. Based on your review of the autopsy report, did it describe -- no, I won't ask you questions about the medical nature.
MS. MIDDLECAMP: But I will make some legal argument as to the nature of the neglect evidence in this case, Your Honor, after Agent Lopez's testimony is concluded.

THE COURT: Okay. That's all the Court has until -- I sometimes follow up after or in connection with defense cross. All right. Thank you.

Mr. Richman, for the record -- if you could identify yourself for the record.

MR. RICHMAN: Robert Richman on behalf of Julius Fineday.

**CROSS-EXAMINATION**

BY MR. RICHMAN:

Q. Good afternoon, Agent.
A. Good afternoon.
Q. I understand that you are not a medical expert, but as you've testified, you have reviewed the autopsy report, correct?
A. Yes.
Q. And, in fact, you testified that your examination of Minor 1's body was consistent with your personal findings, correct?
A. Yes.
Q. The autopsy determined that the cause of death was from the combined effects of malnutrition and invasive group A streptococcal infection, correct?
A. Yes.
Q. There were a number of other findings in the autopsy, correct?

A. Yes.
Q. For example, she suffered from pneumonia, correct?
A. I know pneumonia was mentioned in there, but there was multiple test results that said that they could have been previous to her death, not necessarily that she was testing positive for everything.
Q. Well, I'm looking at the first page summary. Would it refresh your recollection if I showed you that report?
A. Yes.
MR. RICHMAN: May I approach, Your Honor?
THE COURT: Yes.
BY MR. RICHMAN:
Q. If you could just read to yourself, starting from there (indicating).
A. "A post-mortem" -- oh, read it myself.
THE COURT: This is Government Exhibit 1, right?
MS. MIDDLECAMP: Yes.
MR. RICHMAN: Government Exhibit 1, yes.
BY MR. RICHMAN:
Q. Does that refresh your recollection that one of the conditions that she was suffering from at the time of her death was pneumonia?
A. Yes.
Q. In addition, she had inflammation in the trachea, correct?

A. Yes.
Q. And inflammation in the trachea -- which is part of the throat, correct?
A. Yes.
Q. -- would be consistent with a reflux disorder, like not being able to keep down food, correct?
MS. MIDDLECAMP: Your Honor, objection, calls for speculation, outside the scope of this witness's knowledge.
THE COURT: Overruled. Answer if you can.
THE WITNESS: I'm not a medical professional and I'm not sure what causes any type of reflux.
BY MR. RICHMAN:
Q. She also exhibited a significantly enlarged heart, correct?
A. Yes.
Q. Do you have any information as you sit here today what the cause was of her enlarged heart?
A. The medical examiner stated that it was most likely that her body was fighting some type of disease.
Q. Some type of disease?
A. Or illness.
Q. Other than malnutrition, correct?
A. Yes.
Q. She also had ischemic hepatitis, correct?
A. Yes.

Q. And do you know what ischemic hepatitis is?
A. I do not.
Q. And she suffered Haemophilus influenza, correct?
A. Yes.
Q. The autopsy also showed that she had not been exposed to illicit drugs or alcohol, correct?
A. Yes.
Q. And there were no signs of bruising or traumatic injury, correct?
A. Correct.
Q. So there was no indication from the autopsy that she had suffered physical abuse, correct?
A. Yes.
Q. And through your investigation to date, did you obtain any information that she had suffered physical abuse?
A. No.
Q. The autopsy indicated that the fatality rate from the streptococcal infection is 30 to 60 percent, correct?
A. Yes.
Q. Even without malnutrition, correct?
A. Yes.
Q. And so from this autopsy report, there is no evidence that the malnutrition would have caused her death alone, correct?
MS. MIDDLECAMP: Same objection as to foundation

and expertise of this witness.

THE COURT: Answer if you think you know.

THE WITNESS: I would not be able to answer if malnutrition alone could have killed her.

BY MR. RICHMAN:

Q. Okay. But we know that the streptococcal infection could have killed her alone because there is a 30 to 60 percent fatality rate, correct?

MS. MIDDLECAMP: Same objection.

THE COURT: I'll sustain. We've gone over that.

BY MR. RICHMAN:

Q. Through the autopsy or through your investigation, do you have any evidence of how long Minor 1 was suffering from a streptococcal infection?

A. No.

Q. And you said that one can contract a streptococcal infection -- it can be introduced through cuts and scrapes, correct?

A. Yes.

Q. Which could have been from the recurrent lice infestation, correct?

A. Yes.

Q. Or it could have been from a cut or scrape anywhere on her body, correct?

A. Yes.

Q. There was no way to say that the lice infestation had anything to do with the streptococcal infection, correct?
A. I would not be able to answer that, correct.
Q. And, in fact, the autopsy noted that she had a small scrape on her knee, correct?
A. I don't recall, but.
Q. The autopsy report also indicated that as a result of the pneumonia that she was suffering from, that would make breathing difficult, correct?
A. Yes.
Q. With respect to the lice infestation, I don't know if the correct word is contagious, but if one person in a household gets lice, it's very common for everyone in the household to get lice, correct?
A. Yes.
Q. And it can -- even when parents do their best to wash their children's hair and pick out the little nits, they can be reinfected with lice, correct?
A. Yes.
Q. It can be in the bedding, in the furniture, in their clothing, correct?
A. Yes.
Q. Kids -- it's not that uncommon for children to become infested with lice from other children in school, correct?
A. Yes.

Q. And, in fact -- so simply the presence of a lice infestation is not an indication of neglect, correct?
A. Medical records from 2019 and 2020 also indicated that the children under the care of Julius Fineday all had lice.
Q. In 2019 and 2020?
A. Yes.
Q. But you haven't answered my question, which is: The presence of a lice infestation is not alone an indication of neglect, correct?
A. Correct.
Q. And, in fact, there was an incident that you described in which one of Julius Fineday's children was infested with lice and was taken directly from the school to the hospital as a result of that infestation, correct?
A. Yes.
Q. And as a result of that hospital visit, through your investigation, what social service assistance did the Fineday family receive?
A. They were given accommodations at the hotel to leave the house so that they could inspect to see what needed to be done.
Q. And so there was an inspection of the house?
A. We've been told by witnesses that, in fact, Family and Children Services did inspect the house.
Q. Okay. So Family and Children Services, then, were aware

that that house was essentially uninhabitable, correct?
A. Yes.
Q. And you went to the house personally, correct?
A. Yes.
Q. How many agents went with you to the house?
A. On the first visit, just myself. And on the next visit, there was three of us.
Q. Three of you.
And so when you went to the house, that was following Minor 1's death, correct, following Christmas of 2022?
A. Yes.
Q. The house was still decrepit, correct?
A. Yes.
Q. There was no heat in the house, correct?
A. Yes.
Q. There was no running water in the house?
A. Yes.
Q. Going back to the heat issue, the furnace was broken, correct?
A. Yes.
Q. There was a wood stove that had a crack in it, so it was not operable, correct?
A. I did not see the wood stove.
Q. There were holes in the walls, correct?

A. Yes.
Q. Insulation hanging out, exposed, correct?
A. Yes.
Q. The house was infested with cockroaches and mice?
A. That's what I was told.
Q. And those conditions are not a sign of neglect, correct?
MS. MIDDLECAMP: Objection to the extent it calls for a legal conclusion.
THE COURT: Overruled. Answer if you know.
THE WITNESS: Specifically just the house itself is not the sign of neglect as long as you can provide the necessary needs for the children.
BY MR. RICHMAN:
Q. Well, those conditions are a sign of poverty, correct?
A. Yes.
Q. Do you have any -- did your investigation turn up evidence that the three defendants were capable of providing heat and running water and a home not infested with vermin, but they simply chose to deprive their children of those benefits?
A. I can't say that I can answer that.
Q. Okay. Well, you've testified repeatedly that the defendants indicated to you and the other agents that there was plenty of food for everyone, but they simply maliciously deprived Jewel of that food. Is that your conclusion?

MS. MIDDLECAMP: Objection to the extent it misstates testimony.

MR. RICHMAN: I'll withdraw the question.

BY MR. RICHMAN:

Q. You received information, and you've repeated it a couple of times in your direct, that the -- some of the defendants indicated to you that there was enough food for everyone, correct?

A. Yes.

Q. Now, how long have you been assigned to the Bemidji office of the FBI?

A. Just over a year.

Q. And throughout that time have you been assigned to cases on the Red Lake Indian Reservation?

A. Yes.

Q. How many cases have you investigated on the reservation?

A. I'd say approximately 20, including, like -- in addition to the cases that I assist with for other agents.

Q. Okay. And since coming to the Bemidji office of the FBI, have you received training in cultural dynamics and sensitivity with respect to the Native American community?

A. None other than what I received in -- when I arrived to Bemidji.

Q. Okay. So can you imagine that there might be cultural barriers that would prevent a Native American person who has

just suffered the death of a child from telling a white FBI agent that my child died because I didn't have enough money to provide food for my child? Can you imagine that there might be cultural barriers when those questions are posed?
A. Well, I'm also Hispanic and -- but I can't answer to how somebody grieving would answer a question.
Q. Now, you testified that Mr. Fineday, Julius Fineday, had five children, correct?
A. Yes.
Q. And those were his biological children, correct?
A. Yes.
Q. And did you learn during the course of your investigation that the mother of those five children lived across the street in Ponemah?
A. Yes.
Q. And have you interviewed her?
A. No.
Q. But you have no information that she provided any support, financial or otherwise, to her five children, correct?
A. No.
Q. And Julius and his five children were living in the living room. There were mattresses strewn across the floor, correct?
A. Yes.

Q. Living with his parents, Sharon Rosebear and Phillip Fineday, correct?
A. Yes.
Q. With five additional children, correct?
A. Yes.
Q. Those children were the children of Derrick Fineday, correct?
A. Yes.
Q. Who is Julius's brother, correct?
A. Yes.
Q. And Derrick Fineday and his girlfriend would often live in that house as well, correct?
A. Yes.
Q. And so there were ten children and, depending on the time, three to five adults living in that house, correct?
A. Yes.
Q. And this -- going back to the conditions in this house, those decrepit conditions had not -- from your examination in December of 2022 had not improved, notwithstanding the involvement of Child and Family Services, correct?
A. Correct. We requested on multiple times that some intervening happen after the death of Minor Victim 1.
Q. That was after her death. And was there a response to those requests?
A. We had requested that all the children be removed from

the house, and our requests were denied.
Q. It was denied?
A. As far as we know, because we cannot, as FBI, put any type of hold on children. We just have to request it.
Q. Okay. And certainly given the condition of the house, Child and Family Services was equally unhelpful before Minor 1's death because the conditions where Minor 1 was living had not improved, correct?
A. Yes. We were the ones that went back up there after everything happened and brought Family and Children Services with us, and they removed every person from the home together as a family unit.
Q. And when did that happen?
A. I believe in February.
Q. And when you say "they removed every person," for what purpose?
A. To get them out of the household conditions.
Q. Okay. That was two months or a month and a half after the death of Minor 1?
A. Yes. That was the first time we could get -- I don't remember the exact date, but that was the first time we could get anyone to take anyone out of the house.
Q. And so that was based --
THE COURT: I'm sorry. Well, perhaps arguable weight for this hearing. How long did that take, did you

say?

THE WITNESS: I don't remember the exact date. It was definitely weeks after. After multiple requests for the children to be removed, we brought law enforcement and Family and Children Services up to the home to ensure that everybody was removed out of the house.

BY MR. RICHMAN:

Q. Because of the determination that that house was not fit for human habitation?

A. Yes. There had been multiple previous complaints to Family and Children Services about the conditions of the house prior to the death of Minor Victim 1.

Q. Complaints by whom?

A. About the conditions of the house.

Q. Right. But you said there had been numerous complaints prior to the death of Minor 1 to Child and Family Services. Who made those complaints?

A. Additional witnesses.

Q. Okay. From outside the family?

A. Yes.

Q. Who were aware of the conditions in the house?

A. Yes.

Q. Now, you testified on direct about -- that Julius Fineday told you that he received payments from Social Services for his children, correct?

A. I don't recall who they were from, but, yes, he did receive monthly -- he received monthly payments for his children.
Q. And he estimated that those payments for his five children added up to about a thousand dollars a month?
A. I don't recall the exact number.
Q. If I tell you that in your affidavit, paragraph 21, you state, "For his part, Julius Fineday indicated he received approximately $1,000 per month and paid his parents approximately 300 to 400 dollars monthly when he and his children resided in their house," does that refresh your recollection?
A. Yes.
Q. So he was receiving a thousand dollars a month. He was paying three to four hundred as rent to his parents, correct?
A. Yes.
Q. So at a thousand dollars a month, that's $12,000 a year. Do you know what the poverty level is for a family of six?
A. I don't know the number.
Q. Would you accept my representation that it's a little over $40,000?
A. Yes.
Q. And we're talking about a family of 13, correct?
A. Yes.

Q. And at times 15?
A. Yes.
Q. Through your investigation, what determination have you made about the total monthly income for the household as a whole?
A. I would have to remember all the numbers to put together and make the calculation.
Q. Well, do you think that that number is important in determining whether what some of the defendants told you about there always being enough food for everyone is financially possible?
A. It would be, yes, an important factor.
Q. Okay. You testified that Sharon indicated that her children were fluffy or chubby; is that right?
A. Yes.
Q. Through your observations, were the other nine children healthy?
A. Yes.
Q. And they did not appear to be malnourished?
A. The children of Julius Fineday were typically wearing baggy clothes, so I could not tell.
THE COURT: I'm sorry. Say that again.
THE WITNESS: The children under Julius Fineday's care, the four were typically wearing baggy clothing when I saw them, so I could not give an accurate answer for that.

But for the children under Sharon Rosebear's custody, they did not appear to be malnourished whatsoever.

BY MR. RICHMAN:

Q. And other than malnutrition, did you observe any signs of neglect or physical abuse?

A. No. Just the lice in the hair.

Q. Okay. Did the other nine children have lice in their hair?

A. The children under Julius Fineday's custody did.

Q. Okay. And you determined through your investigation that Julius Fineday has not been employed for the last several years, correct?

A. Yes.

Q. He supplements his income by doing Native American crafts and trying to sell them, correct?

A. Yes.

Q. And you also received information from Sharon Rosebear that she tried to shampoo Minor 1's hair and brush the lice out, correct?

A. Yes.

Q. And that happened on various occasions?

A. At least one time that it happened.

Q. And that happened in the summer, correct?

A. Yes.

Q. And there was no running water, correct?

A. Yes.
Q. And, in fact, did you receive information through your interviews that Minor 1 refused to be touched by people?
A. Yes.
Q. And that she was a very lively child, correct?
A. I'm not sure if lively --
Q. Or active.
A. Active, yes.
Q. And it was also very difficult to get her to eat, even when there was food available, correct?
A. We had differing interviews. When everything happened on Christmas, we were told that she had no issues with food and she kept food down and she ate most of what was in front of her. And then later we were told that she was picky.
Q. Okay. In your affidavit you state that, in paragraph 42, that the defendants willfully deprived her of necessary food.
Other than the fact that she was malnourished, what evidence do you have that any of these three defendants deprived her of available food?
A. One of the other children from -- under Julius Fineday's custody stated that grandma would not feed them, but grandpa would feed them. And we were told that if the children fell asleep and it was dinnertime, that if they missed a meal, it was their fault and they could not eat. And also that at

times Julius cooked too late and the children would already be in bed and so they wouldn't get any dinner.

Q. Okay. Well, would you agree that in order to determine whether she was willfully deprived of food which was available to her, that it would be necessary to make a determination of the total income for the household?

MS. MIDDLECAMP: Objection, Your Honor, calls for a legal conclusion.

MR. RICHMAN: It just calls for common sense.

THE COURT: I'll let it go. I've been letting questions go. Go ahead.

THE WITNESS: I think we would definitely need to take it into consideration. And we still have a lot of investigating to do to determine what the financial income was, because we don't have any documentation showing any of that, and what their spending was, as well as the amount of food that there actually was at the house.

MR. RICHMAN: Thank you. I have nothing further.

THE COURT: When you're ready, Counsel.

MR. MORRISON: Thank you, Judge.

**CROSS-EXAMINATION**

BY MR. MORRISON:

Q. Agent Lopez, Aaron Morrison is my name. I represent Ms. Rosebear.

And Mr. Richman covered a lot of ground, and I

just have some specific follow-ups regarding Ms. Rosebear. Okay?
A. Okay.
Q. One of the things that the Court asked and has been asked repeatedly is who had some legal responsibility for the different kids here; fair?
A. Yes.
Q. Okay. You have uncovered no court documents, legal documents that suggest Ms. Rosebear had any responsibility for J.F.; is that correct?
A. For -- pardon?
Q. For J.F. There's no legal documents --
A. I have no legal documents showing that.
Q. Okay. And when I refer to J.F., those are the initials of Minor Victim 1, correct?
A. Yes. There's just multiple J.F.
Q. And I'll make it clear that I'm referring to the minor victim here.
A. Okay.
Q. And certainly you also, through your investigation from talking to various witnesses, including Social Services, never learned that anybody suggested that Ms. Rosebear had any kind of legal responsibility for J.F.; is that fair?
A. Yes.
MS. MIDDLECAMP: I'm going to object to --

THE COURT: I'll sustain that. There's so many aspects.

MS. MIDDLECAMP: Just for the record, yeah, objection to form and compound question.

MR. MORRISON: I'll break it down.

BY MR. MORRISON:

Q. You interviewed and met with Social Services regarding this case?

A. We met -- we have talked a little bit to Family and Children Services, but we're waiting on -- we've served a subpoena, so we are waiting on actual documentation first.

Q. Okay. And in those conversations, no one from Social Services suggested that Ms. Rosebear had any legal guardianship over J.F.; fair?

A. For Family and Children Services?

Q. Yes.

A. That hasn't been -- no interview that I have done has been discussed with them on that yet.

Q. Okay. And you didn't learn from Red Lake School District, they didn't suggest she had any legal responsibility for J.F.; is that fair?

A. Yes.

Q. Okay. And then there was some discussion about -- any other witness suggest to you during your investigation that Ms. Rosebear had any kind of legal obligation to J.F.?

A. No.
Q. And then there was some discussion about receiving money for the kids. Any documentation that you've uncovered that showed Ms. Rosebear received any funding for J.F.?
A. No. We're still waiting on any type of documentation, though, for that.
Q. Okay. Any witness suggest Ms. Rosebear was receiving money that should be designated for the care of J.F.?
A. No.
Q. Okay. You indicated that at least on one occasion Julius Finebear -- or Julius took the kids to get COVID shots?
A. Yes.
Q. Okay. And you indicated that Ms. Rosebear stated that she had taken the kids to some medical appointments as well, correct?
A. Yes.
Q. Do you know if that -- she was talking about the same occasion for the COVID shots or --
A. She did not clarify. Just stated that when she was taking her children, she would just take all of them.
Q. Okay. Could it have been the COVID shots? You just --
A. There was no clarification.
Q. Okay. You also testified that you learned from I believe you described them as school witnesses, that when

the school reached out, they would contact Ms. Rosebear?
A. Yes.
Q. And do you have any context of that, an example of that? What was the context of that occurring?
A. It was interviews done by my colleagues for multiple witnesses, and they each told me that each witness that they spoke to confirmed that whenever there was a concern with any of the children in the household, that Sharon Rosebear was the go-to person to talk to about the children.
Q. And did anybody explain why Ms. Rosebear was the go-to person?
A. These are very recent interviews and so I haven't read or listened to the full interview yet.
Q. Do you have any idea when the school had contacted Ms. Rosebear about the kids?
A. I don't have that yet.
Q. Okay. Could that have been -- do you know if it was prior to Christmas 2022 or was it after Christmas of 2022 when these contacts occurred?
A. I would have to review with my colleagues.
Q. Okay. You don't know as you sit here today?
A. Yes.
Q. Okay. And certainly, to be clear, the kids did remain in the custody of the family members after December 25th for a period of time, correct?

A. Yes.
Q. You talked about Ms. Rosebear expressing an awareness about J.F.'s sickness around Christmastime. Do you recall that testimony?
A. Yes. Yes.
Q. And you had sat down with Ms. Rosebear and her husband and had this interview, correct?
A. Yes.
Q. And that was at their house?
A. Yes.
Q. Okay. Did you record that interview?
A. We did.
Q. Okay. And you still have a copy of that recording?
A. Yes.
Q. Okay. And can you tell me -- you testified that Ms. Rosebear recalled J.F. requesting some medicine?
A. Yes.
Q. And that was J.F. making the question herself?
A. Yes.
Q. Okay. So she presumably was talking and interacting --
A. So she had made the request to her father, and then Sharon Rosebear gave the medicine to Julius Fineday, who gave it to J.F.
Q. Okay. So we don't know if Ms. Rosebear heard the request from J.F. or if it was just what Julius was

requesting?
A. I would have to go back to the interview and check, but I do know Sharon Rosebear said she gave the medicine to Julius Fineday to give to J.F.
Q. Okay. And do you have a timing of when she gave the medicine to Julius?
A. It was leading up to -- it was while they were preparing to leave for the hotel because she stated that she was busy with her preparations, so she wasn't really paying attention to what was going on with Jewel --
Q. Okay.
A. -- or Minor Victim 1.
Q. Okay. Did she express any other observations about J.F. prior to leaving on December 24th for the hotel?
A. I would have to review the interview again.
Q. Nothing you recall here?
A. Nothing I can recall right now.
Q. Okay. We heard some testimony about children -- or Social Services coming out to the house, and that was, to be clear, prior to December 25th, correct?
A. That's what we were told.
Q. And this was in relation to one of Julius's children having lice?
A. Yes.
Q. Do you know the month that that happened, the year that

that happened?
A. It would have been -- the call for Julius's child was on December 6th, so it was about two weeks prior to Minor Victim 1's death, and Family and Children Services called the school and said that they were going to check the house. So it was during that two-week period.
Q. Okay. Two weeks prior?
A. Yes.
Q. And it sounds like they did go out and check the house?
A. That's what the school was told, was they checked the house, but they were not aware that Jewel even existed or Minor -- that Victim 1 even existed.
Q. Okay. We don't know what they did when they out or what checking the house means?
A. Correct.
MR. MORRISON: Okay. Thank you, Agent Lopez. I don't have any further questions.
THE WITNESS: Thank you.
THE COURT: Mr. Zayed.
MR. ZAYED: Thank you, Your Honor.
THE COURT: When you're ready, Counsel.
MR. MORRISON: You can take it if you need it.
MR. ZAYED: May it please the Court, Your Honor. R.J. Zayed on behalf of Phillip Fineday, Jr.

**CROSS-EXAMINATION**

BY MR. ZAYED:

Q. Good afternoon, Agent Lopez.

A. Good afternoon.

Q. I want to follow up on a question that Mr. Richman asked you. I, like you, am Hispanic, so the question I have for you: Isn't it likely that a parent who cannot afford to feed his children would be ashamed to be talking to law enforcement about his inability to feed them; isn't that right?

A. I could understand where there would be shame with that.

Q. Now, how many times did you speak with Mr. Phillip Fineday?

A. Two times.

Q. Two times?

A. Yes. We also briefly interacted as well when we went to the house with Family and Children Services.

Q. So three times?

A. Three interactions; two interviews.

Q. Okay. When was the first interview?

A. On Christmas.

Q. Christmas?

A. Yes.

Q. Was that the interview at the hospital?

A. Yes.

Q. Okay. How is it that he was at the hospital?
A. He had drove there from the hotel.
Q. And who told him to drive there from the hotel?
A. I would -- I'm not sure on that, who he received a phone call from.
Q. But he showed up?
A. Yes.
Q. And you met him at the hospital?
A. Yes.
Q. What was his state upon learning that his granddaughter was dead?
A. He was devastated.
Q. Devastated?
A. Um-hmm.
Q. And yet you charge him with willfully neglecting her?
MS. MIDDLECAMP: I am going to object, Your Honor.
THE COURT: Sustained.
BY MR. ZAYED:
Q. So he was devastated, right?
A. Yes.
Q. Now, also -- what else did you discuss with him that day?
A. We were concerned about his health because he had told us he had a heart condition and so we asked if he would like to speak with the doctor that was there, and he said no.

Q. Okay. So he had a heart condition, right?
A. Yes.
Q. He also has a breathing problem, right?
A. I just have spoken to him about the heart condition.
Q. Did you know he also had COVID?
A. We were told that he had COVID at one point. I don't know when.
Q. Other than his condition, did you talk to him about anything else?
A. We talked about -- we asked questions about Jewel or Minor Victim 1 and the family and all the children that were in the house, and only -- there were only, I believe, seven or eight of the children listed when we got that list. And then we asked about the conditions of the house. He had told us there was no septic and it had been about a year and a half since they had had a septic.
Q. Now, did he tell you that he loved all his grandchildren?
A. I believe he -- I mean, it's my impression that he loves his children without him having to say it.
THE COURT: Grandchildren, right?
THE WITNESS: Grandchildren.
BY MR. ZAYED:
Q. Grandchildren and children as well, right? He had three boys living there, correct?

A. Two sons.
Q. There was Julius. There was Derrick, who showed up from time to time?
A. Yes.
Q. And there was Jerry, who suffers from schizophrenia, right?
A. I don't know anything about that child.
Q. Those three boys also lived in that house. Did you know that?
A. No. This is the first I've heard of it.
Q. Now, did you talk to him on Christmas Day about the condition of the family home up in Ponemah?
A. Yes.
Q. Didn't he tell you that he had been trying for a long time to get Tribal Services to help him fix the house?
A. Yes.
Q. Didn't he tell you that he couldn't afford to do it himself and so he was seeking help from Tribal Services to fix that house?
A. I'm not sure if there was a statement about financial, but he did state that he had asked and had been waiting for assistance with the house.
Q. Repeatedly?
A. Yes.
Q. And when you went up to that house, that house had a

broken front window that was boarded up, right?
A. Yes.
Q. You walk into the house. The walls are demolished, are destroyed, right?
A. Yes.
Q. There's insulation hanging out, right?
A. Yes.
Q. Five children are living on mattresses on the living room floor with Julius?
A. Yes.
Q. Phillip has one of the bedrooms with the boys from his other son, Derrick, right?
A. I'm not sure of the living arrangements, but I do know there was children in his room and children in Sharon's room.
Q. And the female children were in Sharon's room, right?
A. I'm not sure which specific children, but I knew that there was children in each of their rooms.
Q. Did you walk through the house?
A. I -- the first time on Christmas, no. I just walked into the living room and kitchen.
Q. Did you know that the house had no running water?
A. Yes.
Q. Did you know that the house had no heat?
A. They had a small heater and they were using the stove.

Q. They were using their stove as a heater?
A. Yes.
THE COURT: Okay. I'm just -- I'm going to take liberty as a judge. What was the sewer system like?
THE WITNESS: They had large garbage cans and storage bins that they would put a toilet seat over, like a handicapped toilet seat, and that's what they used. Then they would have the buckets or the bins to be dumped.
BY MR. ZAYED:
Q. Returning to the hospital, did you have any discussions with him beyond his health and general family conditions?
A. We did -- we asked questions about Minor Victim 1, about food, keeping food down, if there had been any recent illnesses, stuff like that.
Q. Let's talk about that Minor Victim 1. What did you ask him about Minor Victim 1?
A. If she was known to eat and what she liked to eat. He said she didn't like eggs, but otherwise she ate and that she kept her food down. We asked if there was any reason why she wouldn't keep food down. And he said when he was leaving for the hotel, that he remembers that she was acting normal.
Q. So when -- the last time he saw her alive as he headed to the casino-hotel at the border of Red Lake, he said she was normal and alive?

A. Yeah. He told us that she said something along the lines of "Hi, grandpa."
Q. Okay. Now, did you discuss with him about -- well, let me back up.
He's not the parent of any of those ten --
THE COURT: I'm sorry. Say that again, Mr. Zayed.
MR. ZAYED: I'm sorry, Your Honor.
BY MR. ZAYED:
Q. Phillip Fineday, Jr. is not the parent of any of the ten children, correct?
A. He's the grandfather.
Q. Grandfather. He is not the legal guardian of any of the ten children, right?
A. Not to our knowledge.
Q. Okay. And so the only reason here is because you classified him as a caretaker, right?
A. Yes.
Q. And the evidence you have him as a caretaker is that he had a big heart and he fed all his grandchildren; is that it?
MS. MIDDLECAMP: Objection, misstates testimony.
THE COURT: Sustained.
BY MR. ZAYED:
Q. What is your evidence that he's a caretaker?
A. That he fed his children --

Q. That's it, right?
A. -- or fed his grandchildren.
Q. That's it, right?
A. At this time, yes.
Q. So here's a man who fed all his grandchildren, right?
A. Yes.
Q. Did you know that he would go without food just to feed his grandchildren? Did you ask him that?
A. I don't recall.
Q. Did Phillip Fineday, Jr. receive any benefits whatsoever from any governmental entity for the care and welfare of any of the ten children?
A. Not to my knowledge.
Q. Isn't it true that the lice infestation at the home was a result of a lice infestation at the school?
A. I don't have knowledge of where the lice came from.
Q. Well, we know that one of the minor children, B. Fineday, had lice in his hair, right?
A. Yes.
Q. And this was around Halloween of 2022, right?
A. Yes, but we also have reports from 2019 and 2020.
Q. I understand. You will have a chance to elaborate when --
A. We have multiple witnesses that stated all of the children had lice for a long period of time.

Q. That's not my question. My question is: In October, around Halloween, 2022 the school intervened and called Family and Child Services because Braylan had lice and had lacerations and had open wounds on his head?
A. Yes, I'm aware of the December 6th report.
Q. After that isn't it true that Family and Child Services delivered a whole bunch of shampoo and other lice treatment to the home?
A. I'm not aware of that yet.
Q. Okay. Isn't it true that they inspected the home?
A. We were told they did, yes.
Q. Isn't it true that the Family and Child Services person from Red Lake went to the home on a weekly basis?
A. Not that I'm aware of.
Q. Did you bother asking about that?
A. One of my colleagues did interview them.
Q. And what did they say?
A. And they said that this case slipped through their cracks.
Q. Slipped through their cracks?
A. Yeah. They were notified about the case and then they had not done anything for quite some time.
Q. Okay. So they let this lice infestation in a completely uninhabitable form -- home to continue, right?
A. That would be -- I mean, we would have to talk to

federal -- or Family and Children Services about that.

Q. Now, tell me about the interview. You said there was an interview. That was recorded, right?

A. Yes.

Q. And that was recorded where?

A. Which interview?

Q. The first one -- was the first one recorded?

A. No.

Q. That was just an interaction at the hospital?

A. Just interaction at the hospital, yes.

Q. Okay. The second time was you met with Phillip Fineday and Sharon Rosebear, right?

A. Yes.

Q. Where did that take place?

A. At their current residence or the residence prior to the death of Minor Victim 1.

Q. At the current residence meaning a habitable home, right?

A. Yes.

Q. And you recorded that one, right?

A. Yes.

Q. How long did the interview last?

A. Just under an hour, I believe.

Q. Isn't it true throughout the interview that it was mainly you talking to Sharon Rosebear, right?

A. It was mostly my colleague.
Q. Which colleague?
A. Special Agent Zane Nevala.
Q. And his main conversation was with Sharon Rosebear?
A. Yes.
Q. Almost everything you learned was from Sharon Rosebear?
A. Most of the questions were answered by Sharon Rosebear.
Q. What specific questions were answered by Phillip Fineday?
A. I would have to go back and review the interview.
Q. And so when we get the recorded interview, we'll be able to find out, right?
A. Yes.

THE COURT: Does he need more tissue or anything? You've got enough?

MR. RICHMAN: Yes, he has some, Your Honor.

THE COURT: All right.

MR. RICHMAN: Thank you.

BY MR. ZAYED:
Q. Now, in your affidavit you made the statement to the effect that Minor 1 does not have any disabilities and does not suffer -- and I'm paraphrasing because I do not have the specific language in front of me -- has no mental health issues. What's your basis for that?
A. We asked multiple of the family members on multiple

occasions and it was the same answer every time, that she had no conditions that they were aware of.
Q. Who did you ask?
A. We asked Julius Fineday and Phillip Fineday.
Q. Okay. Did you learn that she did not like to be touched?
A. Yes.
Q. Did you learn that she was very peculiar about her food?
A. I guess could you describe "peculiar"?
Q. She wouldn't eat a lot of things.
A. We had different accounts of how she would eat just fine and we had other accounts where she was picky.
Q. Well, who said she ate just fine?
A. Phillip Fineday at the first interview.
Q. Okay. And who said she didn't?
A. Who said she didn't?
Q. Um-hmm.
A. I'd have to go back and check, but we had multiple interviews around the same time.
Q. So at least Phillip Fineday is telling you that she ate just fine?
A. Said she didn't like eggs.
Q. Didn't like eggs, but she ate and that he prepared meals for all his grandchildren, including her?
A. Yes.

Q. He didn't say, "I excluded her," right?
A. No.
Q. Are you aware of an incident where the Minor 1 refused to eat and her father was so concerned, he was trying to feed her, almost force feed, and he couldn't do it because she was very upset and became physical?
A. I'm not aware of this.
Q. You don't know about that?
A. No.
Q. Nobody bothered telling you that?
A. No.
Q. Now, there's only one small store in Ponemah, right, grocery store, if you could call it that?
A. Yes.
Q. How far of a walk is it from the uninhabitable home to that grocery store?
A. I would have to measure it. I'm not aware of the exact distance.
Q. It's more than one mile, isn't it?
A. Pardon?
Q. It's more than one mile, isn't it?
A. I'm honestly not sure.
Q. Okay. Ponemah is an isolated community, right?
A. What do you mean by "isolated"?
Q. Well, it's far removed from Redby?

A. Yes.
Q. It's far removed from Red Lake?
A. Yes.
Q. You have to take Highway 1 --
THE COURT: I want to follow up. Earlier you testified about the nearest grocery store within walking distance. That could mean so many things. I mean, unfortunately for me, that might be more than three blocks, I drive.
THE WITNESS: Yeah, and it is common --
THE COURT: You can also walk two miles if you needed to.
THE WITNESS: And it is common for people to walk a lot on Red Lake.
THE COURT: Like, what do you -- so is it like -- are we talking about a 15-minute walk, a 30-minute walk, an hour walk? Any idea?
THE WITNESS: I'm not sure, Your Honor.
THE COURT: Okay. Fair enough. Fair enough.
Go ahead.
BY MR. ZAYED:
Q. And then the grocery store is very small?
A. Yes.
Q. Not much of a selection, right?
A. I haven't been inside of it, so --

Q. You've never been --
A. -- I wouldn't be able to --
Q. -- inside of there?
A. I have not been inside the grocery store.
Q. So you don't know if they have anything nutritional in that store, do you?
A. I wouldn't be able to answer that.
Q. And you know it's very expensive?
A. I do not know the prices.
Q. Given that it's the only grocery store within 50 miles, you wouldn't know what their prices are?
A. I have no recollect -- or no knowledge of their prices.
MR. ZAYED: That's all I have, Special Agent Lopez. Thank you.
THE WITNESS: Thank you.
THE COURT: Ms. Middlecamp.

**REDIRECT EXAMINATION**

BY MS. MIDDLECAMP:
Q. Special Agent Lopez, you were asked by Mr. Richman whether the presence of lice is in and of itself enough to establish neglect. Do you recall that?
A. Yes.
Q. What is it about the lice infestation you observed at the hospital that Minor 1 was suffering that did cause concerns to law enforcement?

A. Just the heavy infestation and the -- underneath the hair where there was multiple wounds and infection -- or not infections, but -- I can't think of the word -- cuts from the lice, open wounds from the lice.
Q. You testified about an incident occurring several weeks prior in which the school called in concerns about another child in the household having severe lice, correct?
A. Yes.
Q. Are you aware of what a school witness described that infestation like? Minor? Mild? Severe?
A. Very severe.
Q. What type of detail did they provide, based on what you know from talking with your colleagues?
A. The witness stated that it had a very distinct smell and it looked like the skin was dying or --
Q. Rotting?
A. -- rotting and it was a heavy lice infestation.
Q. And did both a sibling from the household and Julius Fineday say the reason Jewel, Minor 1, did not attend school at all was because of lice?
A. Yes.
Q. And she was seven. And what is the age in that school district she would have been expected to start attending school?
A. Six.

Q. You were also asked some questions about the willful deprivation question -- or standard. Do you recall being asked a couple questions about evidence of willfulness?
A. Yes.
Q. Did Sharon Rosebear accuse Julius Fineday of not always sharing the food he brought into the household with everyone?
A. Yes.
Q. And did Julius Fineday express that his mother, Sharon Rosebear, sometimes didn't want to share all of her food with the household?
A. Yes.
Q. And the house had at least one mini fridge. And some witnesses described efforts to keep food separate from some or others, correct?
A. Yes.
Q. And you testified you don't know all of the details of the financial cash flow, income, expenditures of the household as you sit here today, correct?
A. Correct.
Q. Your investigation is still ongoing, correct?
A. Yes.
Q. However, you have received some uncorroborated statements from people about possible places the adults in the household were spending their money, correct?

A. Yes.
Q. What information have you received about how Sharon and Phillip Fineday may have used money in the household other than on care or feeding of the children or upkeep of the household?
A. At the casino.
Q. And are you referring to gambling?
A. Yes.
Q. Have any witnesses alleged any substance use by Sharon Rosebear or Phillip Fineday that would presumably cost money to fund?
A. Yes.
Q. What about Julius Fineday?
A. Yes.
Q. When you say, "Yes," what do you mean?
A. Narcotics.
Q. And, again, you haven't had an opportunity to fully conduct the interviews or investigation that would allow you to corroborate or not whether those are true, correct?
A. Yes.
Q. Is one of your manners of analysis comparing the condition of Minor 1 to other children in the household?
A. Yes.
Q. And is it true that five of the other children in the household, the cousins of Minor 1, appeared to law

enforcement to be well fed?
A. Yes.
Q. And did it also appear that at least the girl children in that cousins group had long hair and it appeared to be well cared for or, rather, didn't have visible lice matting?
A. I don't recall the exacts about their hair, but school witnesses did say that the girls were much cleaner and better dressed than the boys, or newer clothes.
Q. Did Sharon Rosebear describe to law enforcement the steps she took to keep the children that she considered her kids less affected by lice?
A. Yes.
Q. What types of strategies did she use?
A. She tried to keep the children separate and then checked their hair and would treat them for lice.
Q. And you've been asked a lot of questions about the state of the house, and it sounds like we're all in agreement it was in a bad way, correct?
A. Yes.
Q. Based on your familiarity with the Red Lake community, is it uncommon for households to be without running water?
A. We were told that in the Ponemah area, it's not uncommon to not have running water.
Q. And did Sharon Rosebear describe ways that they used a hose and a kiddie pool for bathing the children?

A. Yes.
Q. Even during winter months, within the kitchen heating water and using that to bathe and care for the children?
A. Yes.
Q. You've also been asked a lot of questions about Child Services and whether or not and when they assessed the home.
Did Phillip Fineday and Sharon Rosebear, without getting into the statements yet, did they make any statements about why they thought FCS might be afraid to come to their home or enforce certain things?
A. I can't recall.
Q. Do you recall Phillip Fineday expressing any kind of prior history with a person employed by Child Services that might make that person reluctant to come to the home --
A. Yes.
Q. -- or confront them?
A. Yes.
Q. And without getting too into the details, suffice it to say Phillip Fineday believed that person from Child Services wouldn't want to confront them because it might dredge up some of that history?
A. Yes.
Q. You were also asked some questions about cultural sensitivity and shame surrounding poverty. Do you recall those questions?

A. Yes.
Q. You were present during the interview of Sharon Rosebear and Phillip Fineday, correct?
A. Yes.
Q. Did law enforcement repeatedly assure them both that it would be completely understandable, with that many mouths to feed, if it had been impossible to feed all of Julius Fineday's children, paraphrasing, but that type of assurance?
A. Yes.
Q. And they insisted that wasn't the case, correct?
MR. ZAYED: Object to form, mischaracterization of "they."
THE COURT: Overruled.
THE WITNESS: Yes.
BY MS. MIDDLECAMP:
Q. And, in fact, Phillip Fineday said something along the lines of, "I didn't even know Minor 1 liked food," correct?
A. Yes.
Q. And this was an interview where they said she was a picky eater, correct?
A. Yes.
Q. They did not attribute her malnourishment to lack of resources, correct?
A. Yes.

MS. MIDDLECAMP: Although the government will have a little bit of legal argument, Your Honor, I don't have further questions for this witness.

THE COURT: Okay. Thank you.

Mr. Richman.

**RECROSS-EXAMINATION**

BY MR. RICHMAN:

Q. So you said that through your investigation you have received allegations of drug use by Julius Fineday; is that correct?

A. Yes.

Q. And those are allegations because you have not been able to corroborate those statements, correct?

A. Yes.

Q. And -- which is why you did not include it in your affidavit, correct?

A. Yes.

Q. So as you sit here today, you don't know if those allegations are true or not, correct?

A. Correct.

Q. And you testified that one of the issues of concern was a comparison of the well-being of the other children compared to Minor 1, correct?

A. Yes.

Q. Because other than lice infestation for some of the

children, you have not received any evidence that any of the other children are not properly nourished, correct?
A. Other than just teachers at school stating that on occasions that the children would ask for extra food and appeared to be very hungry.
Q. Okay. Did any of the teachers express a concern that the other children were malnourished?
A. No.
Q. And so the comparison of the children, if Minor 1 is the only one who was seriously malnourished, that could indicate that she was being singled out and deprived of food, that would be one possibility, correct?
A. Yes.
Q. Or another possibility is that she had some condition not identifiable through an autopsy that prevented her from thriving, correct?
A. It's possible.
Q. And as you sit here today, you can't say which of those is the correct hypothesis, correct?
A. She wasn't brought to the doctor since 2020 other than a COVID shot, so there would have been no way to diagnose that if there was something new.
Q. Okay. And so as you sit here today, you can't say which of those is the correct hypothesis, correct?
A. Her last doctor's visit in 2020 she was in a very

healthy percentile for weight and at the time of her death she was not, so the first four years of her life she appeared to be very healthy when it comes to weight.

Q. And you can't say -- I'm asking now for the third time and still waiting for an answer -- can't say whether in those three years she had some condition that prevented her from obtaining the -- either that prevented him from eating or prevented her from absorbing the nutrients from food, correct?

A. Yes, I cannot answer that.

MR. RICHMAN: Thank you. Nothing further.

MR. MORRISON: [Inaudible.]

**RECROSS-EXAMINATION**

BY MR. MORRISON:

Q. Just to follow up similarly on your testimony that you had heard that Ms. Rosebear was spending money at the casino. Have you done any follow-up investigation to confirm that that's true?

A. Yes. We are waiting on records.

Q. Okay. So you haven't done any follow-up investigation?

A. We've requested records, but we just have to -- and we have done interviews.

Q. Okay.

A. But until we receive the records, we can't verify the amount of money spent.

Q. And I think you also suggested that Ms. Rosebear was using money on substances -- controlled substances?
A. We had multiple witnesses state that she used painkillers.
Q. Okay.
A. And possibly sold painkillers too.
Q. And sold them as well?
A. That's what witnesses have said. We haven't been able to verify any of this.
Q. No police reports through Red Lake, anything like that to confirm that?
A. Not yet.
Q. Okay. And then you talked about -- Mr. Richman was asking about children at the school had asked for extra food. Was that -- are you implying Ms. -- the children Ms. Rosebear was responsible for were in that group of asking for more food?
A. No. Just the children under Julius Fineday.
MR. MORRISON: Okay. Thank you.
THE COURT: Mr. Zayed.

**RECROSS-EXAMINATION**

BY MR. ZAYED:
Q. I didn't quite follow your testimony about Family and Child Services. Is it your testimony that Family and Child Services were afraid to intervene at the Phillip Fineday,

Sharon Rosebear, Julius Fineday home because they were afraid of Phillip from something that happened sometime in the past; is that your testimony?
A. That's what Phillip told us, because of a previous interaction years prior with one of the case workers.
Q. But that's something you learned from Phillip, right?
A. Yes.
Q. Did you follow up with Family and Child Services to ascertain why they didn't go there?
A. Not yet. It was just based off what Phillip told us.
Q. Did you follow up with Family and Child Services of why they let this one slip through the cracks?
A. Part of the reason was that they stated a lot of the workers did not want to enter the house because of the living condition and the infestation of insects.
Q. Okay. So they did not want to go to the house because the house was infested and it was not habitable?
A. That's what Family and Children Services told us.
Q. And their job is to protect families, right?
A. Yes.
Q. Wow.
Now, you cast what I can only call an aspersion as -- with respect to money being spent at the casino. Exactly what is your testimony?
A. We have received statements from multiple witnesses that

Sharon Rosebear liked to gamble and spend money at the casino.

Q. What did you receive about Phillip? Was he an addicted gambler?

A. I don't have anything with him about addiction to gambling.

Q. At all, right? Do you have anything about him gambling there at all?

A. Not at this time.

Q. You know that the reason that they went to the casino was to give their children baths, right?

A. They did say that they gave their children baths there.

Q. And a nice warm bed in a comfortable surrounding that's not infested, right?

A. Yes.

MR. ZAYED: Nothing further.

THE COURT: Ms. Middlecamp?

MS. MIDDLECAMP: Nothing further for this witness, Your Honor.

THE COURT: Okay. Thank you. You've been testifying for a while. Thank you. You may step down.

Anything else? Still government's case.

MS. MIDDLECAMP: Just some brief argument, Your Honor.

THE COURT: Okay. Before we do arguments,

defense -- Mr. Richman, any witnesses?

MR. RICHMAN: No witnesses, Your Honor.

MR. MORRISON: No, Your Honor.

MR. ZAYED: No witnesses, Your Honor.

THE COURT: Okay. All three defendants have indicated no witnesses; therefore, let's proceed with arguments.

MS. MIDDLECAMP: Thank you, Your Honor.

The government does not take a child neglect case lightly in that it clearly impacts a family that has lived in circumstances that are likely outside the understanding of anyone in this courtroom other than the defendants. However, there are certain aspects of this case that make it clear it rises above the threshold of probable cause for the charge that is lodged.

And I want to say something about that charge. The current charge against the three defendants is not homicide. It is significant to law enforcement and to the government that the autopsy report ruled Minor 1's death a homicide, but the government would still be standing before this Court with the same Complaint if instead Minor 1 was sitting in a hospital room right now recovering. It is the failure to provide necessary food and necessary health care resulting in substantial bodily harm.

And even if she had not died on Christmas Day, if

instead she had been ill enough that someone else had called 911 and taken her to get well, to get necessary medicine for an infection, to get necessary fluids to address dehydration, to get necessary nourishment to address long-term starvation, those conditions and the severe lice infestation would still be enough to meet the threshold of substantial bodily harm arising from deprivation of necessary food and necessary health care.

It's not all food or all health care. An adult can choose to take a child for a COVID vaccine, can choose to provide a child food sometimes and deprive them food others, but the autopsy report makes clear that this was long-term starvation.

And the witness testimony and the state of the lice infestation makes clear this was long-term severe lice infestation, resulting in damage to the scalp and likely a source of the infection.

Mr. Richman's questions are well taken that we don't know as of today and we don't have a medical expert here to say, and I doubt a good medical expert would necessarily be able to narrow it down, exactly to which cut on which body part resulted in the infection.

But what is clear is that Minor 1 asked for help in the days leading up to her death. She asked for medicine. She asked for her mother. And multiple adults in

the household heard that ask and did not bring her to the hospital.

And even if that interaction hadn't happened, if instead a sibling had come to school and said, "My sister is at home, she's never been to school because she has a severe lice infestation," that alone, even setting aside the malnourishment, would be enough to support a charge of willful deprivation of necessary care, resulting in substantial bodily harm.

But we do have the added piece of the malnourishment, and that's where multiple caretaker roles in the household come in. 609.378, under Minnesota statute, charges not only a parent, not only a legal guardian, but also any caretaker who willfully deprives a child of necessary food, clothing, shelter, health care, or supervision.

So here there's no question that Julius Fineday is a parent and the legal guardian. His responsibility to provide necessary food and health care to his child is obvious.

But a second statute under Minnesota law provides the definition of what does it mean to be a caretaker. That statute is Minn. Stat. 609 .376, and subdivision 3 states that, "'Caretaker' means an individual who has responsibility for the care of a child as a result of a

family relationship or who has assumed responsibility for all or a portion of the care of a child."

So that means if a kid goes to a babysitter and gets injured and that babysitter doesn't step in and take them for necessary care, that babysitter is a caretaker and culpable.

Here we have, despite some discrepancies, clear witness testimony -- or clear witness statements to the testifying agent that for at least the year leading up to Minor 1's death she lived in a shared household with three adults, three adults who were all capable of doing certain caretaking roles.

It's not the government's allegation that Phillip Fineday, the grandfather, had as active a role as Sharon Fineday. I think their interview verbal dynamics probably mirror some of the role they took in the household, who was more in charge, who was less in charge. That's certainly possible.

But what the statements to law enforcement and the investigation show is that Phillip Fineday had access to all the food in the household and was able to cook large meals for the whole home.

Phillip Fineday was home every day. He didn't have a job. Sharon Rosebear was home, did not have a job. Julius Fineday, home every day, didn't have a job. And

Jewel Fineday, Minor 1, was home every day starving to death.

All three of those adults assumed responsibility for food and grocery and cooking sometimes based on their statements to law enforcement. All three of those adults were able to step in and do more, and that clearly gets it over the probable cause threshold.

Now, at trial there will certainly be some heated and complex family explorations of who truly had more of an ability to intervene and in what way. The investigation is ongoing into some of those details.

But both Phillip Fineday and Sharon Rosebear were repeatedly given the opportunity by law enforcement to explain or at least say yes or acknowledge when law enforcement volunteered for them repeatedly, "It would be understandable if money was too tight, if that's what was going on here. You have your own five mouths to feed. Maybe Julius's five additional mouths was just too much." And they repeatedly said, "No, we always had plenty. Look at our kids. They're well fed."

That -- there may be some argument at a trial about why someone would be motivated to say that does not factor into whether the government has established its probable cause burden at this stage, and that touches on the last piece.

So I think I've stated the government's position on why they're all caretakers, that substantial bodily harm doesn't even require this Court to make a conclusion about whether it was the death or the malnourishment or the lice infestation, because all of those things independently are substantial bodily harm.

So I will just say a few more words on the willfulness, that some of the children in the house were -- that the defendants themselves described some of the children of the house as being well fed, that each of the adults said it wasn't lack of resources that was going on, and one of the children in particular fell through the cracks enough to die. That is willfulness under the statute, that we don't have to have evidence of a particular time where everyone else got a sandwich and Minor 1 didn't get to have one.

Some interviews are still ongoing, but it is enough at this stage for the Court to have evidence that five of the children in the household were described by the grandparents as fluffy or chubby and well fed. They got taken to a casino or water park for running water and a bed, and other children in the household were left behind.

And so for those reasons we think the record is clear that probable cause has been met at this stage and that the charges should stand as charged.

Thank you.

THE COURT: Thank you.

Mr. Richman.

MR. RICHMAN: Your Honor, Child and Family Services has admitted that this case slipped through the cracks, and I would say that even that is an understatement because that suggests some form of negligence, where the evidence here suggests a complete and intentional abrogation of responsibility. And because of that breakdown of the system, these three defendants are now being blamed for an inability to care for ten children.

The evidence is that these defendants took steps to get help and, like the FBI, they were thwarted. And if it took the FBI's intervention to finally get some assistance, then maybe this is a good thing. But poverty is not a crime.

The statute in this case, Minnesota Statute 609.378, requires a showing at this case -- at this stage probable cause to believe that a parent -- and obviously Julius Fineday is the parent of Minor 1. We are not claiming that he did not have responsibility for her. He did. But it requires that a parent who willfully deprives a child of necessary food, clothing, shelter, health care, or supervision appropriate to the child's age.

So that's the willfulness standard, which requires

that he act intentionally to deprive her of food, which according to the statute, in circumstances in which that food is reasonably -- or the parent is reasonably able to make the necessary provisions. So the government has to prove probable cause that he acted willfully and those resources were reasonably available to him.

The fact that there were nine children out of ten who did just fine suggests -- I would say establishes probable cause to believe that there was a medical issue with Minor 1. There is no evidence that this was a malicious deprivation of food and resources to Minor 1, where the other nine enjoyed adequate food.

This was a child who refused to be touched, who refused to leave the house, who was living in dire circumstances. And the government has done nothing to show other than statements of three proud individuals, who insisted that they had enough to show that those resources -- that they were reasonably able to make the necessary provisions.

And so it's our position that the government has failed in its burden, even the lower burden at this stage, to show probable cause to believe that Mr. Fineday acted willfully and that the resources were reasonably available to him. And therefore, we would ask the Court to dismiss the Complaint.

Thank you, Your Honor.

MR. MORRISON: I won't repeat Mr. Richman's arguments, but certainly would join in them.

And I would just add for Ms. Rosebear that there is really no evidence presented today that she willfully deprived Minor Victim 1 anything. In fact, the evidence was quite the opposite.

There was testimony about her attempting to wash and clean and take care of her hair. There was testimony about her bringing water in from the outside and heating it up and bathing the children. There was testimony about being frugal and bringing -- making sure there was food in the home, preparing meals. There was testimony about when Minor -- when Julius asked for medication for the daughter, that she provided it. And there's testimony that she brought all of the kids to the doctor. So there's nothing to suggest that she ever willfully deprived Minor Victim 1 any care.

When she left the home, there's no evidence to suggest that Minor Victim 1 was in immediate acute medical distress other than being potentially sick and needing some medicine that they believed could be taken care of with over-the-counter medication. She was left in the care of her father.

I think the fact that she took the children she

was legally responsible for to the casino shows she never assumed responsibility, as the statute requires, for the care of Minor Victim 1. So it's not -- the babysitter doesn't apply here. She's not Minor Victim 1's babysitter. There is no evidence to suggest she's assuming the care of Minor Victim 1.

And the family relationship statute, what's that? That there's nothing in the case -- Minnesota case law that suggests simply because someone is a grandmother that they assume all care under the statute for what happens.

Ms. Rosebear took care of her kids, offered up care, and there's no evidence that she was legally, under the legal definitions of a caretaker for this statute, responsible for Minor Victim 1. And there's certainly no evidence that she willfully, intentionally deprived care, health care, or anything from Minor Victim 1.

MR. ZAYED: May it please the Court.

Your Honor, under 609.376 of the Minnesota revised statute, it says a caretaker means, quote, an individual who has responsibility for the care of a child as a result of a familial -- a family relationship or who has assumed responsibility for all or a portion of the care of a child.

The only thing the government proved here is that when Phillip Fineday cooked, he cooked for his entire family, all of them. When Minor 1 -- when he was told Minor

1 was dead, he was devastated. Those are not my words. Those are the words of the government agent.

Now I would like to -- as part of my authority, I would like to cite to State vs. Cyrette, C-y-r-e-t-t-e, 636 N.W.2d 343. It's a Minnesota Court of Appeals case in which the court analyzes and defines "willfulness."

And I will provide this quote to the Court from that opinion, and if Your Honor wants, I will provide the Court with a copy of the opinion and specific cites. It basically says, (As read) "A parent, legal guardian, or caretaker, who willfully deprives a child of necessary food, clothing, shelter, health care, supervision appropriate to the child's age, when the parent, guardian, or caretaker is reasonably able to make the necessary provisions and the deprivation harms or is likely to substantially harm the child's physical, mental, or well-being is guilty of neglect of a child."

Now, what's important here, the courts in Minnesota have defined "likely" to mean more likely than not. And I can provide the Court with authority on that and I would request to be provided until Monday to provide a letter brief on that subject matter. But more likely than not.

What does the autopsy say? The autopsy says this child was malnourished, she was suffering from a raging

infection, her body was swollen, she was suffering from pneumonia, and maybe, maybe the cause was the lice infestation lacerations. Maybe that's how it came in. Maybe that's what killed her. Maybe. Maybe not. That is not more likely than not.

So the government, first of all, fails to establish that it was likely that the deprivation caused the harm.

The court goes on to say, "The child-neglect statute criminalizes negligence. Our reading of the statute finds support in tort law, where the term 'willfully' means 'an aggravated form of negligence.' 'Willfully' applies to conduct that is negligent, but that 'is so far from a proper state of mind that it is treated in many respects as if it were so intended.'"

The government has utterly failed to present any evidence that Phillip Fineday's state of mind in many respects -- was so far from a proper state of mind that it is treated in many respects as it were so intended.

"The most common meaning assigned to 'willfully' in the tort context is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that the harm would follow, and which thus is usually accompanied by a conscious indifference to the

consequences." That's the standard. They've utterly failed to meet it, and I ask that the Complaint be dismissed.

THE COURT: Any reply?

MS. MIDDLECAMP: Your Honor, by that standard alone I don't know how the Court could look at the photos of Minor 1's body and not see that standard has obviously been met, or the autopsy report.

There is no dispute that all three adults were in the household and stepping maybe in and out of different caretaking roles for the groups of children. It is not required that the government provide evidence of exactly which day who was responsible for which meal or who took the kids to school each time or who took the kids to the doctors each time.

What is clear is that Minor 1 did not go to the doctor in three years. Minor 1 did not gain a pound in three years. And there is no insinuation that any of the three adults in the household were not able to observe her starving, her failing to put on weight.

And so if the argument is, oh, well, it was a medical condition, that's why health care -- necessary health care is also in the statute, because it's not acceptable or criminally allowed under the law to sit by and watch a child not able to put on weight for over a year -- for actually three years, but at least one year when all

three shared a home and do nothing.

Minor 1 was never sent to school while other children in the household were sent to school, and the reason given by multiple witnesses is because her lice was so bad she couldn't be sent to school; whereas, other kids were able to be clothed and fed and sent to school.

So the Complaint should not be dismissed. This is a tragic case all around. There is no question that tragedy follows this case and will going forward, but the willfulness standard has been met.

There is clear evidence that they were reasonably able to provide because there were nine other children in the house that did not suffer the severe consequences that Minor 1 did.

Even if different interpretations could -- if down the road, let's say, a witness says maybe there was a medical condition, the failure to take her to a doctor at all while other kids were taken to the doctor is a willful neglect of healthcare needs, even if it's not just the few days leading up to her death, which is a combined effect from malnourishment and infection.

So the Complaint should not be dismissed and the case should proceed.

THE COURT: Mr. Richman, anything else?

MR. RICHMAN: Nothing further, Your Honor.

THE COURT: Mr. Morrison?

MR. MORRISON: Nothing, Your Honor.

THE COURT: Mr. Zayed?

MR. ZAYED: Nothing further, Your Honor. Thank you.

THE COURT: Thank you. Thank you, everyone, for presenting this case.

Well, obviously this case -- we have spent a long time. We usually don't spend this much time on a preliminary PC hearing, basically. I'm quite glad we did, though, because I think it aired out a lot of things in open court and I think it's important to have aired out in open federal court.

The only other, I guess, additional comment, a little more of an aside, is someone very close to me who is going to the Peace Corps later on this year and he's going overseas and I was thinking, after this testimony, perhaps there's some service he could do here within the boundaries of the United States.

Look, there's so many issues in this case, and I was quite involved in juvenile court for a number of years when I was a state judge and very familiar with the CHIPS situations. There's just so much to unpack just from the testimony we've heard today.

But I am focused on what my role is here for

purposes of today, and it isn't to address all those other things that I just alluded to. I'm here to focus on PC, and I believe the government has satisfied PC.

This is obviously a very, very challenging case on so many different levels. And I don't take the PC arguments lightly, by the way, in this -- they're serious arguments, but I believe we've hit the factors for caretaker, as well as the willfulness, as well as a reasonable ability and availability of resources.

The last one is a little challenging because of the totality of the circumstances -- of the evidence I heard today, but I think it does say something if a number of the children there appear to be, you know, fed okay at least -- I won't go beyond that -- and this child hasn't gained any weight -- meaningful weight in several years, in essence, and is so underweight.

And, yeah, there's just a lot going on and, you know, by nature we have a lot of direct as well as circumstantial evidence that supports it. And, again, I'm just here focusing on -- my role is making a call on the PC in this. Obviously, there's different legal standards that apply in a criminal case and we'll see how those shake out.

But, yeah, I mean, it's a very -- it's a terrible scenario. You know, I look at -- you know, we do have at least a year where people -- a lot of people are living

under one household, but to me it's, like, a shocking manifestation of the lice infestation and also the weight. Those really grab me in this.

So I'll leave it at that and go from there, and I guess we'll have to proceed forward as each of the parties deem fit.

Anything else for purposes of today?

MS. MIDDLECAMP: No, Your Honor. Thank you.

THE COURT: And from the government -- or from defense? Sorry, Mr. Richman.

MR. RICHMAN: No thank you, Your Honor.

MR. MORRISON: No, Your Honor.

MR. ZAYED: I do have an issue, Your Honor. At some point I think the Court needs to visit the no contact order. Right now Phillip Fineday, Jr. is prevented from seeing his grandchildren at all. I think that order needs to be modified to allow him to see them under supervised conditions.

THE COURT: Yeah. Don't they usually -- I mean, again, this is more of my CHIPS experience. Usually -- that's under CHIPS. I don't know what --

MR. ZAYED: Right now there's a no contact order, and that's improper.

THE COURT: That might be appropriately addressed at another time.

MS. MIDDLECAMP: Only to state for the record, Your Honor, that there is a provision for supervision in the presence of law enforcement because of concerns about obstruction and other relationship issues.

The no contact order states the defendants may not have direct or indirect contact unless with approval of the supervising probation officer and with supervision by law enforcement. It doesn't need to be the FBI, but law enforcement supervision visits can occur.

There was evidence presented at the initial appearance -- or a proffer, rather, of some obstruction concerns and that's why the order was requested.

THE COURT: Okay. All right. Actually, you know, to the extent -- obviously, the parties should keep on talking and see if there's anything that sort of makes sense that would permit this, but I think that's for another day.

So anyways. Okay. Anything else?

MS. MIDDLECAMP: No. Thank you, Your Honor.

MR. RICHMAN: No, Your Honor.

MR. MORRISON: No, Your Honor.

MR. ZAYED: No, Your Honor. Thank you.

THE COURT: Okay. Thank you, everyone, for investing so much effort and time into this, and I'm sure emotional energy. Thank you.

We are in recess. Thank you, everyone.

(Court adjourned)

* * *

I, Lori A. Simpson, certify that the foregoing is a correct transcript to the best of my ability as a certified court reporter from the official digital recording in the above-entitled matter.

Certified by: _s/ Lori A. Simpson_

Lori A. Simpson, RMR-CRR